## Commonwealth v. Ritter.

*Vincent A. Carroll*, Assistant District Attorney, for Commonwealth.
*Louis F. McCabe* and *Edward A. Kelly*, for defendant.

STERN, P. J., March 27, 1930.—The defendant, Willard A. Ritter, pleaded guilty to an indictment charging murder. The case is before the court to determine the degree of the crime, and, under the provisions of the Act of May 14, 1925, P. L. 759, to fix the penalty if it should appear that the defendant committed murder of the first degree.

The hearing of the testimony revealed, briefly, the following facts:

The defendant, Willard A. Ritter, is thirty-eight years old. He lived in Norwood, Delaware County, Pennsylvania, was a painter by trade, and for a time was in the real estate business; subsequently, he conducted a hotel or apartment-house, known as the White Horse Hotel, on the Chester Pike. He was married twenty-two years ago and has five children, the oldest twenty and the youngest nine years of age, the two oldest children being married. His wife is living and testified on his behalf at the hearing.

Except for the fact that he would occasionally indulge in drink, he seems to have lived on reasonably happy terms with his wife and family until the year 1924. At that time he and his wife became socially intimate with Mr. and Mrs. Thomas J. C. Kennard, the two men having become interested together

in some real estate transactions. The two couples saw each other very frequently, sometimes daily, playing cards, dancing and going on trips together. Gradually there developed a growing intimacy between the defendant and Mrs. Kennard, and while the testimony does not indicate exactly when meretricious relations between them began, it would appear that they started about four years ago. Mrs. Ritter expostulated with Mrs. Kennard concerning the matter, but to no avail, and on two occasions there were altercations between Mr. Kennard and the defendant, in which the defendant was beaten. The defendant quarreled with the brother and mother of Mrs. Kennard, and would alternately threaten to do away with the whole family and then apologize for his attitude.

Mr. and Mrs. Kennard were separated two or three times for short periods, and from 1927 on Mr. Kennard and his wife practically ceased living with one another. In 1928, Mrs. Ritter obtained a divorce from the defendant on the ground of cruel and barbarous treatment, arising, apparently, out of drunken spells on his part. It is intimated that Mrs. Kennard and the defendant actually lived together at one time during this period, and he seems to have taken more and more to drinking; indeed, to such an extent that he went to a sanitarium or hospital for the treatment of nervous and mental diseases in November, 1927, and stayed there for a period of two weeks, and went again to the same institution in December, 1928, for a period of one week, his condition in both instances being diagnosed as one of alcoholism. The doctor who treated him at this hospital testified that while defendant was a patient there he was emotional to the point of hysteria, that he was extremely excitable, and would break down and cry "over apparently nothing." During this same period of the last four years he was also arrested several times for charges growing out of drunkenness. In the divorce proceedings, Mrs. Ritter testified that he was sober on an average of only two days a week, that he "got very mean" when drinking, and that later on he was drunk every day.

Nellie A. Kennard, the wife of Thomas J. C. Kennard, was a woman thirty-seven years of age. She had been married for a period of sixteen years, and was the mother of three children, aged, respectively, fourteen, nine and two years.

On Dec. 7, 1929, the defendant rented an apartment at the home of Mr. and Mrs. George L. Patchel, at No. 412 South 15th Street, Philadelphia, and Mrs. Kennard visited him and spent the week-ends there with him, bringing there her two-year-old child. On Sunday afternoon, Dec. 29, 1929, the defendant and Mrs. Kennard had a violent quarrel, the exact origin of which is not disclosed, but the result of which was that Mrs. Kennard took a framed photograph of herself, which was in the defendant's apartment, and broke it violently upon a chair, whereupon the defendant struck her in the face. Mr. and Mrs. Patchel insisted that she leave the apartment. She told them, by way of apology for the quarrel, that the defendant was all right except when he was drinking. The Patchels testified that the defendant showed considerable agitation and excitement. Mr. Patchel stated that after the quarrel the defendant looked like a man completely deranged, and Mrs. Patchel said that he looked like a man who had suddenly lost his reason. He told Mr. Patchel that he loved Mrs. Kennard better than his life, that he could not live without her, that he was no good, and that he "might as well finish it;" he also kept saying that he would kill her. He refused to dine with the Patchels that evening, telling them that he could not eat and that his nerves were all gone, and that as a matter of fact he had not eaten for four days.

That night the defendant tried repeatedly to reach Mrs. Kennard on the telephone, but without success. He spent the evening at the home of his wife; although, as above stated, she had divorced him, he seems to have continued to some extent friendly relations with her, and they were then living in the same house. Mrs. Ritter testified that he was very much upset, and at his request she gave him veronal tablets in order that he might sleep. On Monday evening, Dec. 30th, the defendant again tried to get Mrs. Kennard on the telephone at her home, and he seems to have prowled around there on the porch. On Tuesday, Dec. 31st, he sought Mrs. Kennard at her place of employment, a department store at 8th and Market Streets, and also kept telephoning to her during the day. That afternoon he told Mrs. Patchel that he loved Mrs. Kennard better than his life, but that he thought she had somebody else. Mrs. Patchel says that when the conversation turned on the subject of Mrs. Kennard, he seemed to go into a frenzy. Meanwhile, at about half-past 2 o'clock in the afternoon, he visited a pawnshop, where he had pawned a revolver some three months before, and obtained it out of pawn by pledging in its stead his overcoat and a ring. He then bought some bullets at another store, which bullets did not exactly fit the revolver, but, unfortunately, as the sequel shows, were sufficient for the purpose intended. He came to the department store in the late afternoon and had a verbal quarrel with Mrs. Kennard. He was overheard to say that he would give her five minutes to make up her mind. She started to call one of the store authorities, whereupon the defendant shot her, the first shot apparently striking her in the back. She then ran away from him, down some steps to a mezzanine floor, and he followed her. She fell and he leaned over her and fired two more shots into her body. As the store employees, who were attracted by the occurrence, began closing in on him, and one of them held him from the rear, he fired two shots into his own body, one into the chest, which was later extracted from in back of his arm; the other bullet entered below the lowest rib, tore four holes in his liver, struck a rib, by which it was deflected, and was later extracted from the right side of his body. While, during the struggle and immediately thereafter, he made some apparent threats against the store employees who were trying to apprehend him, and desired to make a charge against one of them who had struck him, these expressions seem to have amounted to nothing more than incoherent and wild remarks on his part.

The employees of the department store who noticed the defendant immediately prior to the shooting said, in effect, that he was agitated and excited, that he looked desperate, and that his eyes were glaring. To one of them, who helped to take him to the hospital, he said that if he did not kill Mrs. Kennard, he "did not make a good job of it," and further stated that "she was a good girl and I am no damn good, but she deserved it."

That evening at the hospital the defendant said to the detectives that he had spent about $55,000 on Mrs. Kennard, that she had broken up his home and broken him, and that now his money was gone she did not want to have anything more to do with him. He further stated that she had made an appointment to meet him that day for lunch, but had failed to keep it. He was eager to know what had become of the picture of Mrs. Kennard which she had broken, because, he said, he wanted good care taken of it, as he "thought a whole lot" of it. He said to one of the detectives: "Now that she is gone I don't care, I am not worried about the electric chair, but I don't want her life and my life exposed, since we have been going together for the past seven years."

These are the essential facts, and from a consideration of them the court has no hesitation in arriving at the conclusion, as it does, that the murder of Mrs. Kennard by the defendant was wilful, deliberate and premeditated and constitutes murder of the first degree.

The real question for the determination of the court is as to the penalty to be inflicted. The Act of May 14, 1925, P. L. 759, provides: "That every person convicted of the crime of murder of the first degree shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict. . . . In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life. . . ."

It will be noticed that this statute leaves the penalty entirely to the discretion of the jury, or, in case of a guilty plea, to the court, and that it prescribes no rules for guidance in the exercise of such discretion, nor does it give any indication as to what was in the legislative mind as to the basis upon which such discretion was to be exercised. Of course, it is certain that the decision on this point, either by a jury or a court, is not to rest upon any conscientious scruple or objection to capital punishment in general. Indeed, if any juror had such scruples, he would be disqualified for service (Com. v. Bentley, 287 Pa. 539). The legislative question whether capital punishment shall be abolished or retained has not been transferred from the law-makers to the court; the law still is that the death penalty shall be imposed in proper cases and on the merits of each case; all that the Act of 1925, in effect, provides is that the death penalty is no longer to be the absolute and exclusive penalty in all cases.

What then should be the punishment inflicted upon the defendant in this particular case? What considerations should weigh in the matter? It must be assumed that the discretion given by the act is to be exercised by the jury or by the court, as the case may be, on some rational basis, and not in an arbitrary, capricious or whimsical manner. The law, however, furnishes no precedents upon which any theory of determination of the question is to be sought. Indeed, it is obvious that the problem is not one of law at all, but only of penology.

In the present case, the court is acting really as a jury, and for that reason is not called upon to express the reasons by which it arrives at a conclusion. And since, as above pointed out, an opinion could have no authority as a precedent, or as laying down any legal principle of value in such cases, there is perhaps nothing to be gained from a judicial standpoint by a formal statement of the reasoning upon which the court's conclusion is based. Since, however, the district attorney has earnestly urged upon the court that the death penalty should be imposed in this case, and counsel for the defendant have argued vigorously to the contrary, and since the life of the defendant is at stake, it would seem to be in order for the court to give some expression to the views which have guided it in its consideration of the important question involved. At least, by so doing, there will be obviated any suspicion that the findings reached by the court are casual or emotional, rather than guided by intellectual processes. As a matter of fact, while in murder cases there is frequent reference to "mitigating" or "extenuating" circumstances, no tribunal, as far as I know, has ever attempted to express the reasoning which leads to a conclusion as to just what such circumstances consist of, or, generally, as to what factors in such cases should incline a jury or a court to imposition of the one penalty as against the other. The entire subject seems to be one of

an uncharted sea, and, therefore, even the expression of an individual opinion may be a slight contribution toward some rationalized penology.

Since, as above stated, the problem involved is one of penology and not of law, it would seem obvious that to look for principles which should govern the case the search must be directed, not to law books, but to standard treatises on penology. Unfortunately penology—and, indeed, criminology in general — is not a subject which has received any considerable attention in learned or scientific circles or educational institutions in the United States, at least from an analytical or philosophical point of view. In Europe the subject has long been regarded as a fairly exact science. From the time of the epoch-making work of the Marquis Beccaria, there have been noted criminologists and penologists in Italy, such as Lombroso, Enrico Ferri and Garofalo—Ferri being the leading exponent of the so-called positivist or Italian, as distinguished from the earlier classical school. In France we have the standard works of Saleilles and Tarde, and in Germany that of Aschaffenburg, while in England the subject has been more or less treated by Havelock Ellis. These names are cited merely to indicate that we are backward in this country in any real scientific study of the abstract principles of penology. Indeed, it would be a great advance in the practice of criminal law in the United States if criminology were made a course of study in the law schools of our universities; it would awaken in the minds of lawyers a realization of the fact that society is vitally interested in the subject, and it would help to bring into the criminal courts lawyers who, being imbued with that idea, would practice the criminal law from a communal rather than a legalistic point of view, and would bring to those courts a dignity and seriousness which are now sometimes lacking.

Passing, however, from this observation, we come to the crucial question underlying this and similar cases, namely, what is the purpose or object at which the law aims in the sentencing of those convicted of crime? Everyone, lawyers and laymen alike, will agree that, in order to determine whether the defendant in this or any other murder case should be sentenced to death or life imprisonment, it is necessary to consider all of the features and circumstances of the crime and the history of the defendant who committed it. But from what point of view are these facts and circumstances to be marshaled? What is the objective to be reached? It is clear, for example, that if the purpose of the penalty is what is ordinarily understood to be punishment, that is to say, retribution, retaliation or vengeance, one should study the facts from that angle in order to decide what degree of suffering ought to be inflicted upon the defendant so that society may be revenged upon him for the crime which he has committed. If, on the other hand, the purpose of the penalty is merely to act as a deterrent upon other potential violators of the law, a totally different study of the facts must be made in order that that purpose may be wisely accomplished. So, too, with considerations of expiation, reformation and the like. In short, one must, before imposing a sentence, arrive in his own mind at some definite conclusion as to the purpose which it is sought to accomplish by the penalty. As was said by Edward W. Cox in his essay on the "Principles of Punishment as Applied in the Administration of the Criminal Law," it is true that: "The principles that should govern the measure of punishment cannot be understood without a clear comprehension of the objects for the attainment of which the punishment is designed."

Generally speaking, there have been advanced four theories as the basis upon which society should act in imposing penalties upon those who violate its laws. These are: (1) To bring about the reformation of the evil-doer;

(2) to effect retribution or revenge upon him; (3) to restrain him physically, so as to make it impossible for him to commit further crimes; and (4) to deter others from similarly violating the law.

Let us briefly consider these in order:

1. As far as the principle of reformation is concerned, however important it may be in the general run of cases, it obviously has little or no application to such a case as the present. Whichever be the penalty here inflicted, the defendant will not again be in contact with society, and since secular law is concerned with one's relation to the community and not primarily with his inward moral development, the spiritual regeneration of a defendant is not, in such a case as this, a dominant factor. In other words, it would not be a practical consideration weighing in favor of life imprisonment that thereby the defendant might be susceptible of moral reformation, whereas the opportunity for this would be denied to him if the death penalty were inflicted.

2. The second theory which has been urged as a basis for the imposition of penalties is that of retribution. This may be regarded as the doctrine of legal revenge, or punishment merely for the sake of punishment. It is to pay back the wrong-doer for his wrong-doing, to make him suffer by way of retaliation even if no benefit result thereby to himself or to others. This theory of punishment looks to the past and not to the future, and rests solely upon the foundation of vindictive justice. It is this idea of punishment that generally prevails, even though those who entertain it may not be fully aware of their so doing. Historically, it may be said that the origin of all legal punishments had its root in the natural impulse of revenge. At first this instinct was gratified by retaliatory measures on the part of the individual who suffered by the crime committed, or, in the case of murder, by his relatives. Later, the state took away the right of retaliation from individuals, and its own assumption of the function of revenge really constituted the beginning of criminal law. The entire course, however, of the refinement and humanizing of society has been in the direction of dispelling from penology any such theory. Indeed, even in classical times moralists and philosophers rejected the idea entirely. Plato puts into the mouth of Protagoras the words: "No one punishes those who have been guilty of injustice solely because they have committed injustice, unless indeed he punishes in a brutal and unreasonable manner. When any one makes use of his reason in inflicting punishment, he punishes, not on account of the fault that is past, for no one can bring it about that what has been done may not have been done, but on account of a fault to come, in order that the person punished may not again commit the fault and that his punishment may restrain from similar acts those persons who witness the punishment."

Seneca taught that the law, in punishing wrong, aims at three ends: "Either that it may correct him whom it punishes, or that his punishment may render other men better, or that, by bad men being put out of the way, the rest may live without fear."

In later days, Beccaria expressed the purpose of punishment as follows: "The end of punishment is simply to prevent the criminal from doing further injury to society and to prevent others from committing the like offense."

Hobbes, in his "Leviathan," said that "we are forbidden to inflict punishment with any other design than for correction of the offender, or direction of others."

Innumerable similar quotations might be given from the works of all the standard penologists and moral philosophers of almost every country and of every age, especially in these latter days of greater humanitarianism in the

treatment of such problems. (See McConnell, "Criminal Responsibility and Social Restraint," from which the above are cited.)

3. Rejecting, therefore, the theory of retribution as a proper basis upon which to impose the penalty of law, we come to the third principle which has been advocated, namely, the restraint of the wrong-doer in order to make it impossible for him to commit further crime. Here we arrive not only at a justifiable basis for action but at one which is vital to the protection of society. To permit a man of dangerous criminal tendencies to be in a position where he can give indulgence to such propensities would be a folly which no community should suffer itself to commit, any more than it should allow a wild animal to range at will in the city streets. If, therefore, there is danger that a defendant may again commit crime, society should restrain his liberty until such danger be past, and, in cases similar to the present, if reasonably necessary for that purpose, to terminate his life. Admittedly, restraint by imprisonment can never be as wholly effectual as execution, and there are, from time to time, cases where imprisonment may not be sufficient for the protection of society. It is on this ground that it is pertinent to take testimony in regard to the history of a defendant and of the circumstances attending his commission of crime. If his record shows that he is of a dangerous type, or that he habitually commits grave crimes, or that he has a homicidal tendency, or that he is hopelessly depraved, or that he has a savage nature, or that he has committed murder under circumstances of such atrocity and inhuman brutality as to make his continued existence one of likely danger to society, then, in my opinion, the sentence of death is both justifiable and advisable. The community may not be safe with such a man in existence even though he be serving a term of life imprisonment; he may again commit murder within the prison walls, or may escape and again make innocent victims his prey, or may even, by cunning simulation of repentance, obtain a pardon from governmental authorities.

Examining the record of the present case from this point of view, in order to determine whether the defendant's continuation in life would be a lurking menace to society, I find nothing in the evidence which would lead to that conclusion. The murder which he committed was the result of many years of entanglement—a terrible tragedy, it is true, but one which was not the result of any bloodthirstiness or lust for crime. His record is that of a drunkard, with a resulting tendency toward quarrelsomeness, but, outside of the present case, he cannot fairly be characterized as a man of uncontrollable violence or of homicidal tendency or having any general enmity to the laws of society. As far as the necessity of his own restraint is concerned, I would conclude, therefore, that, by his incarceration in prison for the remainder of his life, society would be sufficiently protected from any further depredations on his part.

4. This brings us to the final and what must be fairly regarded as one of the most important objectives of punishment, namely, the element of deterrence—the theory which regards the penalty as being not an end in itself but the means of attaining an end, namely, the frightening of others who might be tempted to imitate the criminal. From this angle a penalty is a cautionary measure, aimed at the prevention of further crime in the community. There has been much controversy and an enormous amount of literature on the subject as to whether the death penalty does or does not act as a deterrent. With that controversy we have nothing to do. As before stated, the law of Pennsylvania retains the death penalty as an optional alternative. The real question is not as to whether the death penalty is in general a deterrent, but

as to the particular kinds of murder cases in which execution would or would not be most likely to effect deterrence. It becomes a problem of determining the basis upon which to make such classification.

My own opinion is that the extreme penalty of death works a deterrent effect, and, therefore, should be aimed against cases where a murder is committed from what might be called a mental, rather than an emotional, impulse—in other words, where the murder is deliberately planned from a sordid motive or where the likelihood of its occurring is callously ignored by those who commit some other crime which may well give rise to it. Typical examples would be cases of highway robberies, burglaries and robberies committed by raids on banks, stores and the like, murders committed by poisoning or other means in order to collect life insurance or to attain some other mercenary end. To my mind, it would be reasonable and proper in such cases, generally speaking, to impose the penalty of death. Where, however, a murder is committed under the impulse of some frenzy or strong passion, or where it results from a mind weakened by long brooding over a social entanglement, or by alcoholism or the like, such a person is not likely to be deterred by the example of a death penalty imposed upon those who committed similar offenses. Such murders are not the result of reasoning or of weighing considerations for or against the intended crime, and, therefore, they are not apt to be repressed by the force of example.

In the present case, the nature of the crime and the psychology of the criminal are clear. For several years the defendant, although a man of mature age, long married and the father of five children, had been embroiled in a love passion for a woman who was not his wife. She, of approximately the same age, and the mother of three children, apparently entered with him upon an illicit relationship. Having, by his business ability, succeeded in achieving a fair degree of material prosperity, he squandered large sums of money upon the woman who had thus come into his life. He developed an extreme jealousy in regard to her and what seems to have been a constant terror that she would desert him, especially when he had arrived at the end of his financial means. He took more and more to drinking and enfeebled his health and mentality to a point where he was obliged to go to a medical institution on two successive occasions a year apart. Finally, he reached so low a depth in the matter of his finances that in order to obtain the very pistol with which he committed the murder he was obliged to pawn his overcoat. He continually haunted the woman, besieging her with visits and telephone calls at her place of employment. For the few days immediately preceding the murder he was in a condition of tremendous excitement and agitation, even to the extent of doing without food. Immediately after the shooting he tried to commit suicide, firing two bullets into vital parts of his body, and it seems miraculous that although one of the bullets caused four perforations in his liver, his attempt to destroy himself was unsuccessful. Although he shot with the intention of killing his victim, and expressed the hope that he had done so, in the same breath he was solicitous about her photograph, for which he had a sentimental affection, and he expressed himself to the effect that, she being gone, he cared nothing about himself and was not concerned about his fate. The very afternoon of the murder he had told the proprietress of his lodging-house that he loved the woman better than his life. In short, the case was plainly one of a frenzied and jealous passion on his part, working on a man destroyed by drink and desperate by reason of the fact that he had come to the end of his resources. For the reasons already stated, it is not believed that the death penalty in a case such as this would have any effect of deterrence on persons

who might commit similar crimes, because offenses of this nature are not the result of calm and thoughtful planning or of rationalized deliberation.

To sum up, therefore, my opinion is that in cases where a tribunal is called upon to determine the penalty to be imposed upon a murderer, the two elements which should be taken into consideration are those of restraint and deterrence, the death penalty being imposed when called for by either of these factors; that the consideration of restraint may demand such penalty when the murderer has a record of crimes of violence, or a homicidal tendency, or commits a murder under such circumstances of calm and deliberate atrocity as to indicate a savage and hopelessly anti-social nature; that the consideration of deterrence may call for the death penalty when the crime results not from an emotional frenzy but from a deliberately and mentally plotted destruction of human life or a crime likely to involve it, as in the instances previously suggested; that otherwise the penalty of life imprisonment may be sufficient for the purpose of the protection of society; and that, from a study and analysis of the testimony in the present case, including the history of the defendant and all the circumstances leading up to, attending and following the commission of the crime, an adequate and proper penalty is life imprisonment. In conclusion, it may be said that, perhaps, after all, the penalty of life imprisonment is not so much a substitute for capital punishment as a slower method of inflicting it.

The court, therefore, adjudges the defendant to be guilty of murder of the first degree, and imposes upon him the penalty of imprisonment for and during the term of his natural life.